**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JORGE LOPEZ MORENO,<br>7606 Silent Wood, Houston, TX 77086<br>(Temporarily Residing in Mexico),<br><br><br>AMELIA CASTANON BELTRAN,<br>7606 Silent Wood, Houston, TX 77086<br>(Temporarily Residing in Mexico),<br><br>   *Plaintiffs*,<br><br>vs.<br><br>MARKWAYNE MULLIN, Secretary of<br>Homeland Security, in his official capacity,<br>MS 0525, 2707 Martin Luther King Jr. Ave<br>SE, Washington, DC 20528-0525 +4;<br><br>DAVID VENTURELLA, Senior Official<br>Performing the Duties of the Director of<br>United States Immigration and Customs<br>Enforcement, in his official capacity,<br>500 12th St, SW, Washington, D.C. 20536;<br><br>RODNEY SCOTT, Senior Official<br>Performing the Duties of the Commissioner<br>of U.S. Customs and Border Protection, in his<br>official capacity,<br>1300 Pennsylvania Avenue, NW,<br>Washington, D.C. 20229;<br><br>TODD BLANCHE, Acting Attorney General<br>of the United States, in his official capacity,<br>950 Pennsylvania Ave, NW, Washington,<br>D.C. 20530-0001;<br><br>   *Defendants*. | Case No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(Violation of Immigration and Nationality Act, Administrative Procedure Act,**
**Due Process, and Suspension Clause)**

1

**INTRODUCTION**

1. Plaintiffs are a Mexican married couple who have lived in the U.S. since 1999 and 2002 and have been in the process of obtaining lawful permanent residency since 2024. During this pending application process, United States Citizenship and Immigration Services granted both Plaintiffs advance parole documents to leave the country briefly and reenter lawfully with parole.

2. On May 20, 2026, after a brief trip abroad, Plaintiffs together attempted to reenter the U.S. via the Laredo-Colombia International Bridge in Laredo, Texas, prepared to present their valid advance parole documents to reenter the U.S. lawfully.

3. Upon arriving at the bridge checkpoint, Plaintiffs were pulled aside, separated, accused of fraud in their immigration applications by Customs and Border Patrol officers, and denied entry. CBP officers engaged in threatening scare tactics during their interrogation of Plaintiffs and issued both plaintiffs an expedited order of removal. Plaintiffs were quickly deported to Mexico.

4. Plaintiffs bring suit to challenge the unconstitutional and unlawful denial of their lawful entry and expedited removal orders, seeking to be restored to the status and circumstances they would have been in if Defendants had followed the governing laws and regulations.

**JURISDICTION, VENUE, AND STANDING**

5. This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq. along with its implementing regulations.

6. The Court has jurisdiction under 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) is a provision

2

of the INA that provides jurisdiction in the United States District Court for the District of Columbia over "[c]hallenges [to the] validity of the system," including regulations and "written" policies regarding expedited removal. The Court also has jurisdiction under 28 U.S.C. § 1331.

7. Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all § 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

## **PARTIES**

8. Plaintiff Jorge Lopez Moreno is a citizen of Mexico and VAWA applicant who was denied entry to the United States and issued an expedited removal order on May 20, 2026. He is married to co-Plaintiff Amelia Castanon Beltran.

9. Plaintiff Amelia Castanon Beltran is a citizen of Mexico and VAWA applicant who was denied entry to the United States and issued an expedited removal order on May 20, 2026. She is married to co-Plaintiff Jorge Lopez Moreno.

10. Defendant Markwayne Mullin is sued in his official capacity as the Acting Secretary of DHS. In this capacity, he directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP"). In his official capacity, Defendant Mullin is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to designate

categories of noncitizens subject to expedited removal

11. Defendant David Venturella is sued in his official capacity as Senior Official Performing the Duties of the Director of ICE, which is the agency responsible for the enforcement of the immigration laws, including the apprehension and detention of noncitizens, inside the United States.

12. Defendant Rodney Scott is sued in his official capacity as Senior Official Performing the Duties of the Commissioner of CBP, the agency responsible for the initial processing and detention of noncitizens who are apprehended at or near the border and placed in expedited removal proceedings.

13. Defendant Todd Blanche is sued in his official capacity as the Acting Attorney General of the United States. In this capacity, he is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and oversees the Executive Office for Immigration Review ("EOIR") (the administrative immigration court system).

## STATEMENT OF FACTS

### *The Expedited Removal Process*

14. The expedited removal statute provides that the process begins—and often effectively concludes—with an inspection by an immigration officer. That officer must, first, determine if the individual is a noncitizen who is inadmissible because he or she has engaged in certain kinds of fraud or lacks valid entry documents "at the time of . . . application for admission." *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

15. If an individual claims to be a U.S. citizen, to have been admitted as a lawful permanent resident or refugee, or to have been granted asylum, then the individual is entitled to

4

limited additional review. *See* 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5). Otherwise, if the officer concludes that the individual is inadmissible under an applicable ground, the officer "shall," with the concurrence of a supervisor, 8 C.F.R. § 235.3(b)(7), order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

16. Thus, a low-level DHS officer can order the removal of an individual with virtually no administrative process—just completion of cursory paperwork—based only on the officer's own uninvestigated conclusions.

17. An expedited removal order comes with significant consequences beyond removal. Noncitizens who are issued expedited removal orders are subject to a five-year bar on admission to the United States unless they qualify for a discretionary waiver. 8 U.S.C. § 1182(a)(9)(A)(i); 8 C.F.R. § 212.2. Similarly, noncitizens issued expedited removal orders after having been found inadmissible based on misrepresentation are subject to a lifetime bar on admission to the United States unless they are granted a discretionary exception or waiver. 8 U.S.C. § 1182(a)(6)(C).

*Flaws in the Procedures for Inspection by Immigration Officers*

18. Under expedited removal, an individual who seeks to contest many of the critical factual or legal requisites for expedited removal receives no meaningful opportunity to do so. The individual bears the burden of proving certain critical facts. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (noncitizen must show continuous presence to "satisfaction of" immigration officer); 8 C.F.R. §§ 253.3(b)(1)(ii) (burden on noncitizen to show continuous presence), (b)(6) (same as to parole or admission).

19. The individual is not provided with any time to prepare; any means by which to gather evidence, present witnesses, or review or cross-examine DHS' evidence; nor any right to counsel recognized by the government or time to obtain counsel—all in sharp contrast to regular removal proceedings where individuals are entitled to such safeguards.

20. The government's policies and interpretations of the statute and regulations fail to guarantee these individuals, who are detained during the inspection process, with time or any opportunity to gather the necessary evidence, nor even the ability to make a telephone call to someone who could help. The inspecting officer is not required to make any independent effort to corroborate or verify any information, unless the individual makes a claim to U.S. citizenship; to lawful permanent resident, refugee, or asylee status; or to having been admitted or paroled.

21. In addition, the government's expedited removal policies fail to require that the immigration officer assess individuals to ensure that they are mentally competent or otherwise have the capacity to participate in the inspections process, and they fail to require additional safeguards should an individual be found to have competency or capacity issues.

22. Likewise, in the expedited removal process, a noncitizen's removability is determined by a low-level immigration enforcement officer who acts as both prosecutor and judge, rather than by a neutral adjudicator, as required in regular removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(A)(i).

23. In addition, the expedited removal policies fail to provide an opportunity for a noncitizen to raise claims that his or her arrest violated a statutory or constitutional requirement.

24. Over the last two decades, extensive studies have demonstrated that the expedited

removal process deprives individuals of a meaningful opportunity to show that they are not subject to expedited removal, or to removal at all. The government is well aware of the widespread inadequacies and flaws in the expedited removal process and yet has failed to adequately address the problem.

25. For example, a 2005 study commissioned by Congress documented numerous "serious problems" in the expedited removal process "which put some asylum seekers at risk of improper return." U.S. Comm'n on Int'l Religious Freedom, Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations 4, 10 (2005), available at https://bit.ly/1GkjQfK ("2005 USCIRF Study").

26. A 2016 follow-up study "revealed continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create, including: flawed Border Patrol internal guidance that conflates CBP's role with that of USCIS; certain CBP officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality assurance procedures." *See* U.S. Comm'n on Int'l Religious Freedom, Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal 2 (2016), available at https://bit.ly/2uydMQ8 ("2016 USCIRF Study").

27. Specifically, multiple reports have documented that immigration enforcement officers routinely make factual errors in completing the forms required for expedited removal. Although the officers are required to take sworn statements from the individual, the sworn statements that are recorded in the forms are "often inaccurate and nearly always unverifiable." 2005 USCIRF Study, at 53, 55, 74; *see also* 2016 USCIRF Study, at 21. The officer taking the sworn statement is often the person translating as well. Asylum officers, who review expedited removal forms in the course of conducting credible fear

interviews, have reported that the forms filled out by immigration enforcement officers commonly contain egregious inaccuracies. *See, e.g.*, Borderland Immigration Council, Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border 13 (2017) ("Borderland Report"), https://bit.ly/2ZxInuV (describing evidence "that CBP affidavits are often inconsistent with asylum-seekers' own accounts").

28. Asylum officers also have reported seeing many forms with identical answers, and others with clearly erroneous ones—such as forms indicating that a male noncitizen was asked and answered whether he was pregnant. *See, e.g.*, 2016 USCIRF Study, at 20-22. 83. Such factual errors are the natural consequence of a system bereft of necessary procedural protections. Furthermore, the government's expedited removal policies fail to provide any adequate check against immigration enforcement officers' failure to comply with required procedures, such as giving the individual an opportunity to review and respond to the statements in the requisite expedited removal forms. For example, asylum seekers commonly report that immigration enforcement officers failed to read their statements back to them but nonetheless pressured them to sign documents. *See, e.g.*, 2016 USCIRF Study, at 20-22. As a result, individuals routinely are deprived of any opportunity to correct errors in their statements before signing.

29. Multiple reports have documented that immigration enforcement officers have routinely employed coercive tactics to force non-English speaking individuals to sign expedited removal forms in English, without any translation or interpretation. For example, when one individual refused to sign the expedited removal forms and asked to speak to a judge, the immigration officer told him: "Here, I'm the judge, the attorney, and the one who is

going to deport you." American Civil Liberties Union, American Exile: Rapid Deportations that Bypass the Courtroom 35-36 (2014) ("American Exile"), https://bit.ly/2GPKeE9; *see also, e.g.*, Borderland Report at 13 ("[I]ndividuals are forced to sign legal documents in English without translation."); American Exile, at 34-36 (describing noncitizens who were required to sign forms in languages they do not understand).

30. Multiple reports have documented immigration enforcement officers engaging in flagrant intimidation to pressure asylum seekers not to express a fear of return. For example, officers often accuse asylum seekers of lying, falsely tell asylum seekers that they have no right to seek asylum, inform asylum seekers that they will be jailed if they continue to assert a fear of return and refuse to sign the expedited removal order, or prematurely assert that the asylum seekers' claim will not succeed.

31. The lack of any meaningful administrative review also contributes to errors. For example, although current regulations technically require a supervisor to review the issuance of an expedited removal order, that requirement is limited to review of the paperwork—which, as described above, is often rife with errors and inaccuracies—and does not provide any independent review of the facts or corroboration of the immigration officer's representations. *See* 8 C.F.R. § 235.3(b)(7). The government also takes the position that expedited removal orders are not subject to federal court review.

32. Numerous reports have described rampant and repeated failures to follow governing statutes and regulations at the border. *See, e.g.*, Borderland Report, at 12 ("CBP and Border Patrol officers in the El Paso Sector routinely and intentionally discourage people from seeking asylum. In 12% of the cases documented for this report, individuals

expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings."); American Exile, at 4, 32-33 (recounting that individuals subjected to expedited removal and interviewed for the report indicated that "they told the agent they were afraid of returning to their country but were nevertheless not referred to an asylum officer before being summarily deported"); Letter from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen. at 12-22  (Nov. 13, 2014), https://bit.ly/1xfFsog (explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information," and providing numerous stories of asylum seekers affected by CBP's failures during the inspections stage of expedited removal).

*VAWA Purpose and History*

33. Congress enacted the Violence Against Women Act (VAWA) in 1994 to address the widespread problem that many noncitizens remained in abusive relationships because an abusive family member held the key to their permanent immigration status in the U.S. *See* VAWA, Title IV, Pub. L. 103-322, 108 Stat. 1796, 1902 (September 13, 1994).

34. As noted in the USCIS Policy Manuel, VAWA "provided certain [noncitizen] family members of abusive U.S. citizens and lawful permanent residents (LPRs) the ability to self-petition for immigrant classification without the abuser's knowledge, consent, or participation in the immigration process." Policy Manuel, vol. 3, pt. D, ch. 1, available at https://www.uscis.gov/policy-manual.

35. In 1997, the Immigration and Naturalization Service (the precursor agency to USCIS, ICE, and CBP) created a centralized and specially trained VAWA Unit at is Vermont

Service Center to adjudicate VAWA self-petitions, with "the intent. . . to ensure sensitive and expeditious processing of the petitions filed by this class of at-risk applicants" and to "engender[] uniformity in the adjudication of all applications of the type." Direct Mail Program; Form I-360, 62 Fed. Reg. 16607-08 (April 7, 1997).

36. In 2000, Congress passed the Victims of Trafficking and Violence Protection Act of 2000, which included the Violence Against Women Act of 2000. Title V, Pub. L. No. 106-386, 114 Stat. 1464, 1518. Passed with overwhelming bipartisan support, this 2000 Act expanded VAWA's protections, including by creating exemptions and waivers for certain grounds of removability, including crimes of moral turpitude, fraud, public charge, and unlawful presence in the United States. *See, e.g.*, 8 U.S.C. 1182(a)(4)(E)(i), (a)(6)(A)(ii), (a)(9)(C)(iii), (h)(1)(C), (i)(1). In doing so, Congress expressly found that "the goal of the immigration protections for battered immigrants included in [VAWA] was to remove immigration laws as a barrier that kept [battered immigrants] locked in abusive relationships" and to provide them "with protection against deportation." VAWA 2000 1502(a)(1)-(2).

37. Congress expanded protections for domestic violence survivors yet again in 2005, with the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162 (2006). The bill's cosponsor Rep. Conyers provided the following remarks in the Congressional Record Extension:

> [Survivors] with deferred action status should not be removed or deported. Prima facie determinations and deferred actions grants should not be revoked by immigration enforcement agents. The specially trained [USCIS] unit should review such cases to determine whether or not to revoke a deferred action grant. . . Immigration enforcement officers should refer [individuals] they encounter who may qualify for relief under this Act to immigration benefits adjudicators handling VAWA cases at [US]CIS.

11

151 Cong. Rec. E2605-04, E2607, 2005 WL 3453763 (Dec. 17, 2005) (Statement of Rep. Conyers).

38. While waiting for their petitions to be adjudicated, VAWA self-petitioners who establish a "prima facie case" may receive federal public benefits. 8 U.S.C. 1611, 1641(c). Thus, "[u]pon receipt of a self-petition," USCIS must promptly determine if it sets out "a 'prima facie case.'" 8 C.F.R. 204.2(c)(6)(i), (e)(6)(i).

39. Those with approved self-petitions may apply to become permanent residents. Because that process can also be lengthy, Congress ensured their protection while waiting by authorizing work authorization and allowing for deferred action grants. 8 U.S.C. 1154(a)(1)(K); Policy Manual vol. 3, pt. D, ch. 5.C.2.

*2021 vs. 2025 ICE Guidance for Victims*

40. In 2001, during the Biden Administration, ICE issued Directive 1105.3 (superseding previous directives on the topic), guiding its officers to use a victim-centered enforcement approach for noncitizens who are victims of crimes and seeking humanitarian protection. ICE Directive 11005.3, Using a Victim-Centered Approach with Noncitizen Crime Victims (Dec. 2, 2021), available at https://www.ice.gov/doclib/foia/policy/11005.3_UsingVictimCenteredApproachNoncitiz enVictims.pdf. This 2021 Directive seeks to "minimize[] any chilling effect that civil immigration enforcement actions may have on the willingness and ability of noncitizen crime victims to contact law enforcement, participate in investigations and prosecutions, pursue justice, and seek benefits" and to "bolster[] faith in the entire criminal justice and civil immigration systems." *Id.*

12

41. The 2021 Directive thus continued ICE's historical policy to "refrain from taking civil enforcement action against" individuals "known to have a pending application" for "victim-based immigration benefits" unless there are "exceptional circumstances" such as national security concerns or a "risk of death, violence, or physical harm to any person." *Id*. at 1-2. If an application is pending, ICE will "defer decisions" on enforcement until final determinations are made on pending petitions or a negative determination is made on an interim adjudication. *Id*. at 2. The 2021 Directive further reinstated a policy of requesting expedited adjudications for people in ICE custody. Id. at 9. "The fact that someone is a victim of crime and . . . may be eligible for victim-based benefits" is considered a "positive discretionary factor. *Id*.

42. Shortly after President Trump took office for his second term, ICE Acting Director Caleb Vitello issued the 2025 Guidance challenged in this case. The sparse 2025 Guidance explicitly "rescinded and superseded the 2021 Policy and earlier policies, replacing them with requirements that, when conducting civil immigration enforcement actions against applicants for survivor-based benefits, ICE officers:

(1) Need only "coordinate and deconflict" with law enforcement agencies;

(2) "[S]hould consult with" ICE attorneys only "to ensure any such action is consistent with applicable legal limitations";

(3) Need not consider the fact that a noncitizen is a crime victim as "a positive discretionary factor"; and

(4) "[W]ill no longer routinely request expedited adjudications from USCIS," but may do so only when it is in ICE's best interests."

2025 Guidance at 2-3, https://www.ice.gov/doclib/foia/policy/11005.4.pdf.

43. Thus, the 2025 Guidance reversed course from agency practice under which immigration agencies generally refrained from enforcement against survivors of crime, unless warranted by adverse factors.

44. The 2025 Guidance devotes a single sentence to justifying this about-face, identifying the sole reason as language from one of President Trump's first-day Executive Orders calling for "the 'total and efficient enforcement of [immigration] laws' against all inadmissible and removable people." *Id*. at 2. It does not reference any of the factual findings or purposes of Congress's enactments or prior immigration policies, much less make any of its own.

*Application of 2025 Guidance to Plaintiffs*

45. Plaintiffs are a husband and wife who have lived in the United States for approximately twenty-five years and have raised a family of U.S. citizen children here.

46. Prior the events underlying this lawsuit, Plaintiff Jorge's entry to the United States was in approximately 2002. Similarly, Plaintiff Amelia entered the United States in 1999. Both have resided in the U.S. ever since these entries.

47. Plaintiffs have three U.S. citizen children.

48. In September of 2024, both Plaintiffs, separately but simultaneously, applied for protection under VAWA as parents of an abusive U.S. citizen. Concurrently with those VAWA applications, Plaintiffs applied for permanent residency, work permits, and advance parole documents.

49. USCIS granted each Plaintiff their work permits and advance parole documents in February 2025.

50. In addition, USCIS issued each Plaintiff a Prima Facie Determination of their VAWA

applications.

51. In March of 2026, Plaintiff Amelia traveled briefly to Mexico and successfully returned to the United States with her valid advance parole document.

52. In May of 2026, both Plaintiffs planned a brief trip together to Mexico with the intention of returning to the U.S. with their advance parole documents. Both Plaintiffs had advance parole documents that were valid from February 2025 until February 2027 (Jorge) and February 2030 (Amelia).

53. Both Plaintiffs attempted to reenter the United States together via the Laredo-Colombia International Bridge between Nuevo Laredo, Mexico, and Laredo, Texas. They were prepared to present their currently valid advance parole documents at that port of entry.

54. To Plaintiffs' shock, despite displaying their lawful travel documents, they were pulled aside by Customs and Border Protection agents upon arrival to the bridge checkpoint and treated with suspicion.

55. CBP agents separated and interrogated each Plaintiff aggressively for approximately eight hours, yelling and cursing and accusing them of fraud in their underlying VAWA applications and (unsuccessfully) trying to intimate Plaintiffs into admitting to such fraud.

56. CBP officers separated the Plaintiffs and aggressively interrogated them about the basis of their VAWA applications. Plaintiff Amelia was interrogated over the same questions by six different officers while being handcuffed by her ankles to a chair. She was also subjected to a full body search. She was eventually forced to answer some questions in a video recording before being sent back to Mexico.

57. Plaintiff Jorge was subjected to similar questioning and denied the opportunity to contact

15

his attorney when he requested it. When Jorge refused to answer questions on a video camera without his attorney, CBP agents became irate.

58. Plaintiffs were not permitted to contact their attorney at any point during their interrogation or during their deportation process.

59. CBP agents then confiscated Plaintiffs' advance parole documents (which also serve as their work permits), social security cards, and state driver's licenses.

60. CBP then issued expedited removal orders for each Plaintiff and had them speedily deported across the border to Mexico.

61. Plaintiffs are now residing in Mexico, separated from their children and community and places of employment in the United States, awaiting adjudication of their still-pending applications for VAWA and lawful permanent residency.

## CAUSES OF ACTION

### Count 1 – Violation of the Due Process Clause of the Fifth Amendment
### to the U.S. Constitution

62. All foregoing allegations are repeated and realleged by reference as though fully restated here.

63. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. . . ."

64. Plaintiffs were entitled under the Due Process Clause to meaningful process, including an opportunity to be heard and to contact their lawyer, before they were removed from the country in accordance with the 2025 Guidance.

65. The 2025 ICE Guidance violates the Due Process Clause.

**Count 2 – Violation of the Administrative Procedure Act:**

**Entitlement to Representation and Contrary to Law**

66. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

67. The APA, 5 U.S.C. § 555(b), provides that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding." Individuals subjected to expedited removal procedures are compelled to appear in person before agency representatives. Congress has not exempted expedited removal proceedings from this requirement.

68. Defendants' application of policies restricting the participation of counsel for individuals in expedited removal during the immigration enforcement officer's inspection to individuals described in the 2025 ICE Guidance violates 8 U.S.C. § 1362 and the APA, 5 U.S.C. § 555(b).

69. In addition, the 2025 ICE Guidance violates the APA because it is, inter alia, agency action "unlawfully withheld," "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law . . . ." 5 U.S.C. §§ 706(1), (2)(A), (2)(C), (2)(D).

70. The 2025 Guidance is contrary to law, in that it ignores Congress' clearly stated purposes in creating the victim-centered benefits of VAWA, U visas, and T visas. As the Central District of California recently held in granting class action injunctive relief from the 2025

17

Guidance,

> The 2025 Guidance is contrary to law because it does not protect VAWA self-petitioners or U visa or T visa petitioners from enforcement, as it states that "ICE officers and agents are not required" to consider evidence that a noncitizen "is a victim of a crime" as "a positive discretionary factor," and does not require ICE to "request expedited adjudications from USCIS" regarding prima facie eligibility, except when it is "in ICE's best interest." 2025 Guidance at 2-3. By allowing ICE agents to turn a blind eye to persons with pending petitions, the 2025 Guidance undermines the legislative scheme Congress designed to protect such individuals from removal.

*ICWC v. Noem*, No. 2:25-cv-09848-AB-AS, at *74 (C.D. Cal. May 20, 2026).

### Count 3 – Violation of the Administrative Procedure Act:

### Arbitrary and Capricious

71. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

72. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

73. The 2025 Guidance is reviewable under the APA because it constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. This is because it marks the consummation of Defendants' decision-making process and is an action "from which 'legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156 (1997) (citation omitted).

74. Section 706(2)(A) of the APA "requires agencies to engage in reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citations and quotations omitted). "[A]gency action must be based on non-arbitrary,

relevant factors which," in the immigration context, "means that the [agency's] approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system. A method for disfavoring deportable [noncitizens] that bears no relation to these matters—that neither focuses on nor relates to an [noncitizen's] fitness to remain in the country—is arbitrary and capricious." *Judalang v. Holder*, 565 U.S. 42, 55 (2011) (internal quotations and citations omitted).

75. When an agency "changes its existing position," it must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). In undertaking "policy change," the agency must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Id*. at 222 (quoting *Fox Television Stations*, 556 U.S. at 51516). "An '[u]nexplained inconsistency' in agency policy is 'a reason for holding [a new action] to be an arbitrary and capricious change from agency practice.'" *Id*. at 212 (quoting *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

76. Among other reasons, the 2025 ICE Guidance is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency. The only explanation provided for this change is the statement in the Invasion Executive Order regarding "'total and efficient

19

enforcement of the [immigration] laws' against all inadmissible and removable" individuals. 2025 Guidance at 2.

77. Here ICE "entirely failed to consider [] important aspect[s] of the problem." *State Farm Mut. Auto Ins. Co. v. Motor Vehicle Mfrs.' Ass'n*, 463 U.S. 29, 43 (1983). If a policy-maker fails to consider even one "important aspect of the problem" when announcing a significant change in policy, "[t]hat omission alone renders [the] decision arbitrary and capricious." *Regents*, 591 U.S. at 30.

78. In a class action challenging the same 2025 Guidance, the Central District of California, in granting injunctive relief, recently found that the plaintiffs are indeed "likely to show that the 2025 Guidance is arbitrary and capricious" for the reasons that: "it reverses decades of policy (1) without a sufficiently-reasoned explanation for disregarding the concerns underlying that prior policy, (2) without considering the reliance interests of persons who have acted in reliance on those policies, and (3) without considering serious aspects of the problem." *ICWC*, No. 2:25-cv-09848-AB-AS, at *69.

### Count 4 – Violation of the Suspension Clause of the U.S. Constitution

1. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

2. Article 1, § 9, cl. 2., of the United States Constitution provides that the "Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

3. Under the government's interpretation of the Immigration and Nationality Act, the 2025 ICE Guidance subjects individuals to expedited removal without federal court review of

20

an expedited removal order, other than with respect to the three determinations listed in 8 U.S.C. § 1252(e)(2) pertaining to alienage, the existence of an order, and whether the individual was lawfully admitted for permanent residence, admitted as a refugee, or granted asylum.

4. Depriving individuals of the right to seek judicial review of an expedited removal order violates the Suspension Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

a. Assume jurisdiction over this action;

b. Declare that the 2025 Guidance is arbitrary and capricious, an abuse of discretion, and contrary to law in violation of the APA;

c. Enter an order compelling Defendants to rescind Plaintiffs' expedited removal orders as the product of an unlawful policy;

d. Issue a writ of mandamus and/or habeas corpus compelling Defendants to return the Plaintiffs to the United States expeditiously under parole, effectively restoring them to the same circumstances they would have been in had the law been obeyed by Defendants;

e. Permanently enjoin Defendants and their agents from taking retaliatory actions against Plaintiffs based on this lawsuit;

f. Award Plaintiff's counsel reasonable costs and attorney's fees under the Equal Access to Justice Act, 28 U.S.C. 2412(d), 5 U.S.C. 504, or any other applicable law; and

g. Award other relief as the Court deems necessary or proper.

Respectfully submitted this 19th day of July, 2026.

/S/ Vanessa Molina
*Attorney for Plaintiffs*
Vanessa Molina Law
4225 Executive Square, Ste 600
La Jolla, CA 92037
619-790-4300
vanessa@vanesssamolinalaw.com

/S/ Elissa Stiles
Elissa Stiles
Rivas & Associates
PO Box 470348
Tulsa, OK 74147
918-419-0166
estiles@rivasassociates.com
*Pro Hac Vice Forthcoming*